IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARYLYN BEAVER,<br><br>    Plaintiff,<br><br>  v.<br><br>BANK OF THE WEST WELFARE BENEFITS PLAN and BANCWEST CORPORATION WELFARE BENEFIT PLAN,<br><br>    Defendants.<br>_____/<br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>    Real Party in Interest.<br>_____/ | No. C 09-02177 WHA<br><br>**ORDER DENYING SUMMARY JUDGMENT MOTION AND REMANDING CLAIM TO PLAN ADMINISTRATOR** |

**INTRODUCTION**

In this ERISA action involving the denial of disability benefits, defendants Bank of the West Welfare Benefits Plan and Bancwest Corporation Welfare Benefit Plan, and real party in interest Metropolitan Life Insurance Company, move for summary judgment against plaintiff Marylyn Beaver.

The complaint alleged claims for both long-term and short-term disability benefits. Shortly after the instant motion was filed, however, plaintiff's claim for long-term disability benefits was stayed for 90 days due to plaintiff's failure to exhaust her administrative remedies. The instant motion, therefore, is limited solely to plaintiff's claim for short-term disability

benefits. As explained herein, MetLife, as the administrator of plaintiff's ERISA plan, was unambiguously granted discretion to determine whether plaintiff was "disabled" under the plan and eligible for short-term disability benefits. Because MetLife also *funded* these benefits, however, a multi-factor "abuse of discretion" standard — designed to account for MetLife's structural "conflict of interest" — applied to the Court's review of its denial of benefits.

Under this standard, MetLife's failure to properly inform plaintiff of particular medical records that were missing from her file during the administrative appeal process constituted an abuse of discretion. MetLife's decision to deny plaintiff's short-term disability benefits was based heavily upon a report prepared by Dr. Richard Kaplan, and independent physician consultant. Dr. Kaplan reviewed plaintiff's file on appeal, and found that particular medical records — such as "orthopedic medical records" and "physical examination findings" — were missing from the file. These files, as Dr. Kaplan's report indicated, were needed to justify plaintiff's claims of disability. MetLife did not inform plaintiff in a meaningful way that she needed to produce these particular files to "perfect her claim," or explain to plaintiff why the medical documents she *did* produce were insufficient to justify her claim of disability.

For these reasons, MetLife abused its discretion in denying plaintiff's appeal, and the motion for summary judgment must be **DENIED**. Plaintiff's short-term disability claim will be **REMANDED** to the plan administrator for reconsideration, with instructions that plaintiff's claim be reopened and plaintiff be allowed to supplement her file with additional medical information.

**STATEMENT**

Unless otherwise noted, the following facts are not in dispute. Plaintiff Marylyn Beaver was a customer service manager for Bank of the West during the events described below (AR 270S).[1] As an employee at Bank of the West, Beaver was a participant in the bank's short-term disability (STD) and long-term disability (LTD) benefit plans.

At the heart of the instant motion is whether Metropolitan Life Insurance Company ("MetLife"), the funding source and claim administrator for defendants Bank of the West Welfare Benefits Plan (the STD plan) and Bancwest Corporation Welfare Benefit Plan (the LTD plan),

---

[1] The administrative record was filed as Exhibit B to the Hallford Declaration.

2

lawfully denied STD benefits to Beaver between June 15 and July 15, 2008 (Br. 2–3; Opp. 2). As shown below, Beaver had been receiving STD benefits since January 15, 2008, due to surgical procedures performed on her neck. As such, only *one month* of STD benefits are at stake in this motion (Opp. 2).

### 1.  METLIFE APPROVES SHORT-TERM DISABILITY BENEFITS

On December 27, 2007, and January 3, 2008, Beaver telephoned MetLife to file a claim for STD benefits due to a surgical procedure scheduled on January 15, 2008 (*id.* at 116–17S). She informed MetLife that recovery from the surgery — which targeted plaintiff's neck — would render her unable to work at Bank of the West as of January 14 (*ibid.*).

After receiving the claim, MetLife requested supporting medical documentation from Beaver (*id.* at 397S, 399S, 400S, 401S). In response, Beaver submitted two medical reports, received on February 6 by MetLife. The first report was of a January 14 examination by neurosurgeon Dr. Robert Sieling. The report indicated that Beaver's surgery was meant to address "pain in [Beaver's] neck and right arm" that plaintiff had been experiencing "for several months" (*id.* 392–93S, 395–96S). The January 14 medical report also indicated that an MRI of Beaver revealed a C5-6 herniated disc at the right side, and set forth a surgical plan for an anterior cervical discectomy and fusion at C5-6 (*ibid.*). The second medical report was a January 17 discharge summary dictated by Dr. Sieling (*id.* at 394S). It noted that plaintiff had undergone the above-mentioned surgical procedure on January 15, and that Beaver's "pain was much better on the right side the following day" (*ibid.*).

MetLife approved Beaver's STD claim in a letter dated February 11, 2008 (*id.* at 390S). The approval granted STD benefits for the period between January 15 and February 25, 2008, but expressly notified plaintiff that "[i]n the event [her] disability extend[ed] beyond February 25, 2008, [MetLife] w[ould] require specific medical information in order to consider the claim for possible continuance of benefits" (*ibid.*). The letter then specified the "specific medical information" required for MetLife to consider an extension of STD benefits beyond February 25. This information included: (1) copies of Beaver's two most recent office notes, (2) operative test

3

1  results, (3) diagnostic test results, (4) rehabilitation or therapy notes, (5) names and dosages of all
2  current medications, (6) functional abilities, and (6) her expected return to work date (*ibid.*).

3  Beaver did not submit any additional "specific medical information" to MetLife by the
4  February 25 deadline (*id.* at 356S). Accordingly, MetLife informed Beaver — in a letter dated
5  March 5, 2008 — that her STD claim was closed as of February 25 (*ibid.*). The March 5 letter,
6  however, expressly informed Beaver that she could seek an extension of STD benefits by
7  submitting an administrative appeal (*ibid.*).

8  On March 7, plaintiff submitted an additional medical report to MetLife seeking an
9  extension of her STD benefits through March 18, 2008 (*id.* at 353–55S, 359S). The report
10 pertained to a follow-up consultation between Dr. Sieling and Beaver on February 25, and noted
11 that while plaintiff's shoulder pain had improved, Beaver had developed pain and ailments in
12 other areas of her body (*id.* at 354S). The report concluded with Dr. Sieling ordering an MRI to
13 "reveal some reason" for the new ailments, and stated that Beaver could "return to full duties with
14 no restrictions on March 18, 2008" (*id.* at 354S, 359S).

15 Three days later, plaintiff submitted to MetLife an additional statement from Dr. Sieling,
16 wherein Dr. Sieling gave plaintiff a return-to-work date of April 4, 2008 (*id.* at 350–51S). The
17 statement, dated March 10, 2008, provided no medical reasons for the change in Beaver's return-
18 to-work date from March 18 to April 4 (*ibid.*). That same day, MetLife called Beaver to inform
19 her that the medical report she submitted on March 7 did not include sufficient medical
20 information to extend her STD benefits beyond February 25 (*id.* at 125S).

21 On March 11, plaintiff submitted even more medical records to MetLife pertaining to a
22 March 10 office visit with Dr. Sieling (*id.* at 340–45S). Based upon these supplemental records,
23 MetLife approved an extension of Beaver's STD benefits through April 3, 2008 (*id.* at 346S).
24 Beaver was informed, however, that she would be required to submit additional medical records
25 in order to extend these benefits beyond April 3 (*id.* at 346S).

26 On April 3 — the same day her extended STD benefits were scheduled to end — Beaver
27 submitted to MetLife a new statement from Dr. Sieling, dated April 2, 2008, giving plaintiff a
28 return-to-work date of June 1, 2008 (*id.* at 336–37S). Additional medical records were received

4

by MetLife on April 7 (*id.* at 331–34S). In these records, Dr. Sieling noted that while plaintiff looked "quite good" at a March 26 consultation and had no new weakness or sensory loss, Beaver was still experiencing pain in her neck and arm (*id.* at 331S). At a subsequent examination on April 2, Dr. Sieling recommended a second anterior cervical discectomy and fusion, which the doctor believed "may help [Beaver's] arm pain" (*id.* at 332S).

Beaver notified MetLife on April 10 that she would be undergoing a second surgical procedure on April 17 (*id.* at 129–30S). MetLife immediately extended plaintiff's STD benefits through the surgery date, and later confirmed the details of the surgical procedure with Dr. Sieling on April 21 (*id.* at 131S). MetLife then approved an extension of Beaver's STD benefits through June 15 to allow "appropriate recovery" from the surgery, and sent plaintiff a letter — dated April 23, 2008 — confirming this extension of benefits (*id.* at 131–32S, 317S). As with MetLife's two prior letters extending plaintiff's STD benefits, Beaver was informed that additional "specific medical information" would be required to extend benefits beyond June 15, 2008 (*id.* at 317S).

### 3. METLIFE DENIES BENEFITS BEYOND JUNE 15, 2008

On April 24, Beaver submitted to MetLife a medical report from Dr. Sieling that documented the surgical procedure and subsequent discharge (*id.* at 312–16S). The report noted that plaintiff "has been troubled for several years with pain in her right arm and neck" and that the prior surgery (in January 2008) resulted in no "appreciable improvement in her pain" (*id.* at 315S). Twenty-four hours after the surgery, which involved a "more aggressive decompression of [Beaver's] right C6 nerve," Dr. Sieling noted that plaintiff "seemed to be considerably better" and was "doing nicely" to warrant her discharge from the hospital (*ibid.*).

One month later on May 30, 2008, Beaver faxed MetLife a request to extend of her STD benefits through July 15, 2008 (*id.* at 309–11S). The request was accompanied by a medical report pertaining to an office visit with Dr. Sieling on May 19, that stated (*id.* at 310S):

> Marlyn [sic] returns. She is doing much better than she did after her first visit. She is not quite ready to return to work, so I gave her a return to work on 7/15/08. She is to return to see me in about 2 months. She does not need any medication. The wound is well-healed and she is getting along quite well.

5

After reviewing this report, MetLife denied Beaver's request to extend STD benefits beyond June 15. This decision was mailed to plaintiff in a letter dated June 16, 2008, and informed her that the medical records submitted on May 30 did *not* evidence a "severity of impairment" that would "prevent [her] from performing the essential duties" of her job at Bank of the West (*id.* at 287–89S). The June 16 letter also noted that Dr. Sieling's report was not supported by any exam findings, documentation of complications during recovery, or restrictions or limitations to showed that specific job duties could not be performed (*ibid.*). Finally, the June 26 letter informed Beaver that the two-month follow-up time frame specified by Dr. Sieling "did not indicate a frequency of treatment consistent with the remediation of a significant, disabling functional impairment" (*ibid.*). As such, MetLife concluded that there was no clinical evidence to support the additional month of STD coverage Beaver had requested (*ibid.*). The letter did, however, invite Beaver to administratively appeal the denial and provide the following information from her treating physician to MetLife (*ibid.*):

1. Abnormal physical exam findings with medical rationale as to why you are unable to perform functional job duties.

2. Current restrictions and limitations that reflect the physical exam findings.

3. Any other testing or treatment records supporting severity of impairment and your inability to perform essential duties of your job with or without restrictions.

### 4. THE ADMINISTRATIVE APPEAL

Beaver administratively appealed MetLife's denial of her STD benefits on October 13, 2008 (*id*. at 138S, 270–72S). In her appeal letter, plaintiff indicated that she had *still* not returned to work "due to pain, which radiates from [her] neck, right shoulder and down [her] arm, right thumb and middle fingers" (*id.* at 270S). She also stated that she was "still being treated for pain in [her] neck and right arm" and "a third surgery on [her] neck [wa]s pending" (*ibid.*). The letter further informed MetLife that arthroscopic surgery on her right shoulder was scheduled on November 6 (*ibid.*). Finally, Beaver informed MetLife that her responsibilities as a customer service manager were not "light duty" as MetLife's denial letter on June 16 had characterized them (*id*. at 270S). Rather, Beaver told MetLife that as a customer service manager, she was

6

1 required to "lift boxes of coins, push/pull coin carts or open/close the vault door" as part of her
2 duties to "stock the bank for business" (*ibid.*). She also told MetLife in this letter that "[u]sing
3 the computer for long periods of time put[] stress on [her] neck and arm and cause[d] excruciating
4 pain" (*ibid.*).

5 Accompanying Beaver's appeal letter was a letter, dated October 4, 2008, from Dr. Eric
6 Messner, plaintiff's personal physician and an internal medicine specialist (*id.* at 262S, 271–72S).
7 Dr. Messner's letter repeated the information in Beaver's letter, but also added that the "extensive
8 repetitive motion activities" and occasional physical activities (*e.g.,* lifting boxes of coins,
9 moving coin carts, and closing bank vault doors) of Beaver's job at Bank of the West aggravated
10 her neck and shoulder conditions (*ibid.*). Dr. Messner further stated that the pain was "often very
11 severe," resulting in Beaver's inability to "carry out the duties of her job in her current physical
12 condition" (*ibid.*). No medical records, however, were submitted with Dr. Messner's letter (*id.* at
13 262S).

14 After receiving Beaver's appeal, MetLife referred plaintiff's file to two independent
15 physician consultants. These consultants were asked to provide their professional opinion, based
16 upon the medical records in the file, as to whether Beaver was functionally impaired or limited in
17 a way that would prevent her from performing her job duties. The first consultant was Dr.
18 Derrick Bailey, a board-certified internal medicine specialist (*id.* at 261–64S). His analysis,
19 however, was not directed towards plaintiff's neck and shoulder conditions, and is therefore not
20 relevant to this order (*ibid.*).

21 Beaver's file was also sent to Dr. Richard Kaplan, a board-certified physical medicine and
22 rehabilitation physician (*id.* at 243–48S). Dr. Kaplan focused specifically on plaintiff's neck and
23 shoulder conditions, paying "specific attention to the claimant's functional status during the
24 period of June 16, 2008, to the present" (*id.* at 244S). Dr. Kaplan's report noted that while Dr.
25 Messner's "summary note of October 4 . . . indicate[d] that following her April 2008 surgery,
26 [Beaver] developed right shoulder symptoms[,]" Beaver's file did not contain *any* orthopedic
27 medical records to enable Dr. Kaplan to independently review this medical condition (*id.* at
28 246S). Dr. Kaplan also noted that Dr. Sieling, in a May 2008 examination, had indicated that

7

1  plaintiff "was doing better symptomatically" and there were "no physical examination findings to
2  suggest an abnormality in the neck or shoulder" (*ibid.*). Dr. Kaplan attempted, on two separate
3  days, to contact both Dr. Messner and Dr. Sieling by phone after preparing his report, but was
4  unable to reach either of them (*id.* at 245–46S). The report concluded that "there was no
5  indication that from June 15, 2008, to the present the claimant had any significant functional
6  limitations" (*id.* at 246–47S). Stated differently, Dr. Kaplan found that there were no *medical*
7  *records* in plaintiff's file substantiating Dr. Messner's statement that Beaver was functionally
8  limited after June 15, 2008 (*ibid.*).

9  Beaver's physicians — Dr. Messner and Dr. Sieling — were both sent copies of the
10 reports prepared by Dr. Bailey and Dr. Kaplan for review and comment on November 13, 2008
11 (*id.* at 231S, 233S). The letters accompanying these reports asked Beaver's physicians to "submit
12 clinical evidence in support of [their] conclusions" if they disagreed with the findings of Dr.
13 Bailey or Dr. Kaplan. Beaver was also notified by letter that her physicians had been sent these
14 reports (*id.* at 234S). Dr. Sieling faxed a response to MetLife on November 13 (*id.* at 235–36S).
15 In his response, Dr. Sieling noted that it was "not unusual for patients that have cervical discs like
16 [Beaver] not to have any significant objective findings" to corroborate their symptoms (*ibid.*).
17 Dr. Sieling then stated that he "would take Marilyn [sic] Beaver to be a reliable person" and that
18 he "believed her" (*ibid.*). No medical records were provided with his response, but Dr. Sieling
19 nevertheless expressed his opinion that the claim should not be rejected (*ibid.*). Dr. Messner did
20 not file a response to either of the reports.

21 The reports of Dr. Bailey and Dr. Kaplan were also sent to two additional physicians of
22 Beaver, upon her request (*id.* at 221S, 223S, 224S, 229S). One of these physicians, Dr. Danny
23 Chan, responded and informed MetLife that due to recovery from shoulder surgery, Beaver was
24 unable to work from November 21, 2008 to December 19, 2008 (*id.* at 196–97S). Plaintiff also
25 sent MetLife additional medical records from Dr. Chan, corroborating the information in his
26 response (*id.* at 225–27S). This medical information pertaining to Beaver's shoulder surgery and
27 subsequent recovery was treated by MetLife as a *new and separate claim* for STD benefits (*see*
28 *id.* at 419S). In other words, Beaver now had two STD claims: (1) the neck-related claim that

8

was being administratively appealed (and is the subject of this order), and (2) a shoulder-related claim pertaining to plaintiff's shoulder surgery in November 2008.

Dr. Kaplan reviewed Dr. Sieling's response as well as the information from Dr. Chan and issued an addendum to his initial report (*id.* at 189–92S). Although Dr. Kaplan agreed with Dr. Sieling's assessment that plaintiff had suffered a herniated cervical disc, he concluded that there was still no objective medical evidence in the record showing that plaintiff was functionally impaired and could not return to work as of June 15, 2008 (*ibid*). Dr. Kaplan further noted that the medical records provided by Dr. Chan were similarly inadequate to determine functional impairment for the period in question (*ibid.*). Finally, Dr. Kaplan emphasized that it was "implausible" that a substantial residual impairment would be present two months after Beaver's April 2008 neck surgery, and similarly "not plausible" that Beaver was unable to perform any gainful employment (*ibid.*). In coming to this opinion, Dr. Kaplan acknowledged that even accepting plaintiff's symptoms of pain, his report was not focused Beaver's symptoms, but rather on her "impairment or functional status" (*ibid.*).

In a letter dated December 24, 2008, MetLife informed plaintiff that the review of her administrative appeal for her neck-related claim had been completed, and that the denial of her request for STD benefits after June 15 had been upheld (*id.* at 171–76S). Having exhausted her administrative remedies, plaintiff filed the instant action.

\*          \*          \*

Shortly after the instant motion was filed, plaintiff's claim with respect to LTD benefits was stayed for 90 days (Dkt. No. 45). This was because plaintiff had not properly submitted a LTD claim with MetLife in the first place, and therefore had not exhausted her administrative remedies (*ibid*.). The instant motion, therefore, is limited solely to the denial of Beaver's STD benefits from June 15 to July 15, 2008, as detailed above.

## ANALYSIS

The parties agree that Beaver's STD claim is ripe for adjudication and is properly before the Court under the Employee Retirement Income Security Act (Br. 2). As such, only three issues must be resolved by this order: (1) what standard of review should apply to plaintiff's STD

9

claim, (2) whether the denial of benefits was unlawful, and (3) whether plaintiff is entitled to discovery to augment the administrative record pertaining to "evidence of conflict" in MetLife's policies and procedures, and Dr. Kaplan's preparation of his independent report.

### 1. STANDARD OF REVIEW

A *de novo* standard of review will apply to actions for the recovery of ERISA benefits, unless the plan in question grants discretionary authority to the trustee or fiduciary. *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 114–15 (1989). If a plan unambiguously grants the plan administrator discretionary authority to construe the plan's terms, the appropriate standard of review is for abuse of discretion, with any conflict of interest included as a factor to be taken into account in deciding whether the discretion has been abused. *See Metropolitan Life Ins. Co. v. Glenn*, --- U.S. ----, 128 S.Ct. 2343, 2346, 2348 (2008); *Firestone*, 489 U.S. at 115.

The STD plan at issue in this dispute contained the following provision (*id.* at 113S):

> **Discretionary Authority of Plan Administrator
> and Other Plan Fiduciaries**
>
> In carrying out their respective responsibilities uner [sic] the Plan, the Plan administrator and other Plan fisuciaries [sic] shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

A similar discretionary clause appeared in the Certificate of Insurance document, stating "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract. This includes the Group Policy, Certificate, and any Amendments" (*id.* at 66S).

Given these clauses, there can be no dispute that MetLife had the discretionary authority to adjudicate claims for benefits under the plan at issue. As such, it is a fiduciary under ERISA, and an abuse of discretion standard applies to plaintiff's STD claim. *See* 29 U.S.C. 1002(21)(A) (A "fiduciary" is an entity with "any discretionary authority" in the "administration of" an ERISA plan); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc); *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023-24 (9th Cir. 2008).

Plaintiff nevertheless argues that *de novo* review should apply because "the record does not connect the [discretionary clauses shown above] to the short term disability insurance certificate." This argument is rejected. Despite plaintiff's attempts to divorce the various plan documents from each other, both of the discretionary clauses noted above unambiguously granted discretionary authority to MetLife to interpret the terms of the plan and determine eligibility for any entitlement to plan benefits. Plaintiff cites to no decisions requiring that these clauses be set forth in particular places among the plan documents (Opp. 1–2). In fact, one of the cases plaintiff *does* cite in another portion of her brief found that a nearly identical grant of discretionary authority (the decision also involved MetLife) was sufficiently "unambiguous" to warrant the "abuse of discretion" standard. *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866–67 (9th Cir. 2008).

Even so, a highly deferential review will not apply. *See Standard Ins. Co. v. Morrison*, 584 F.3d 837, 848 (9th Cir. 2009). The Ninth Circuit recently reiterated that in situations where an ERISA fiduciary both decides who is entitled to benefits and pays for benefits, there is a direct financial incentive for the fiduciary to deny claims. *See Saffon*, 522 F.3d at 867–68. MetLife is such a fiduciary (AR 64–115S; Br. 4; Hafner Decl. ¶ 2). In such situations where there is a structural "conflict of interest," the standard is *not* whether the fiduciary's decision was "grounded on *any* reasonable basis." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629–30 (9th. Cir. 2009) (emphasis added). Rather, the court must perform a more "complex analysis" of "case-specific factors" including (1) the extent to which a conflict of interest appears to have motivated an administrator's decision, (2) the quality and quantity of the medical evidence, (3) whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, and (4) whether the administrator provided its independent experts "with all of the relevant evidence[.]" *Id.* at 630.

### 2. ABUSE OF DISCRETION

The question presented is whether MetLife abused its discretion when it found that plaintiff was no longer "disabled" under the terms of the plan as of June 15, 2008. While the

11

issue is admittedly a close one, this order finds that based upon the undisputed facts in the administrative record and governing Ninth Circuit law, MetLife *did* abuse its discretion when it denied plaintiff's STD benefits for the disputed one-month period.

The STD plan at issue required that the plan member be found "disabled" before receiving STD benefits (AR 81S, 84–85S). As the plan administrator, MetLife had the discretion to determine whether Beaver was "disabled" under the terms of the plan.

The STD plan defined "disability" as follows (*id.* at 86S):

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you:
>
> 1. are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 2. are unable to earn more than 80% of your Predisability Earnings at your Own Occupation for any employer in your Local Economy.

As the facts set forth in this order illustrate, MetLife ultimately denied Beaver's fourth request to extend her STD benefits because there was no objective medical information in the record to support a finding that she was functionally limited from performing her job during the period in question. Given this backdrop, this order turns to the factors set forth in *Montour* that the Court must consider in evaluating the reasonableness of MetLife's decision.

**A.  Conflict-of-Interest**

Since MetLife both decides entitlement to benefits and funds approved benefits, this order must give serious consideration to whether MetLife's denial of plaintiff's STD claim was motivated by a conflict of interest. *Montour*, 588 F.3d at 630. Here, the administrative record weighs against such a finding. It is undisputed that MetLife approved Beaver's initial request for STD benefits starting on January 15, 2008, and then approved numerous extensions to these benefits through June 15, 2008. Taking into account the 30 day elimination period (a period during which the plan member is "disabled" but no benefits are paid), MetLife paid over 17 weeks of STD benefits to Beaver (*id.* at 80S). This amounts to over 75% of the maximum amount of benefits she could have possibly received for her claim (*ibid*.). Given this track record, this order does not find that MetLife's denial of plaintiff's *fourth* request for an extension of benefits

12

1  was motivated by a "conflict of interest." There is no evidence in the administrative record that a
2  conflict of interest motivated the decision in question.

### B. Medical Evidence Considered & MetLife's Communication with Plaintiff

This order must also consider the quality and quantity of the medical evidence considered by MetLife when it denied Beaver's request for an extension of benefits. This includes an inquiry into whether MetLife's independent physician consultants — particularly Dr. Kaplan — had "all of the relevant evidence" necessary to evaluate plaintiff's disability, whether MetLife adequately informed plaintiff that it needed additional medical documentation, and whether MetLife should have performed an in-person medical evaluation of Beaver. *Montour*, 588 F.3d at 630, 634; *Abatie*, 458 F.3d at 968-969, 972, 974.

In denying plaintiff's request to extend her STD benefits from June 15 to July 15, 2008, MetLife emphasized that plaintiff failed to submit sufficient medical documentation to evidence a "severity of impairment" that would "prevent [her] from performing the essential duties" of her job at Bank of the West after June 15, 2008 (AR 171–76S, 287–89S). Indeed, the administrative record shows that MetLife consistently based its determination of Beaver's "disability" on clinical medical records (patient examination and test results, office notes, etc.) rather than bare and unsubstantiated statements by physicians or plan members. Specifically, MetLife required "supporting medical documentation" for Beaver's initial determination of "disability" and "specific medical information" to support every extension of plaintiff's benefits (*see, e.g.*, *id.* at 317S, 346S, 390S, 397S, 399S, 400S, 401S). When these clinical records were not provided to MetLife, Beaver's STD benefits (or extensions thereto) were denied (*see* 125S, 356S). Plaintiff, however, was always informed of these deficiencies by either letter or phone and given the opportunity to remedy them, which she did on various occasions by submitting supplemental medical records to MetLife (*see id.* at 340–45S, 353–55S, 359S).

Here, the administrative record shows that Dr. Kaplan — the independent physician consultant whose opinion was heavily relied upon by MetLife to deny plaintiff's requested extension of benefits — did not have certain medical records to independently evaluate plaintiff's medical condition. In his reports, Dr. Kaplan was very specific as to what medical records he was

13

1    missing. For example, both Dr. Kaplan's initial report and follow-up addendum noted that he did
2    not have Beaver's "orthopedic records" to evaluate whether Beaver's shoulder condition after her
3    April 2008 surgery was functionally limiting, as claimed by Dr. Messner in his letter filed in
4    support of plaintiff's appeal (*id*. at 189S, 246S). Similarly, Dr. Kaplan frequently pointed to a
5    lack of "physical examination" findings to suggest an abnormality in Beaver's neck or shoulder
6    after June 16, 2008 (*ibid.*).

7    The crucial question, however, is whether MetLife properly informed Beaver that it
8    needed this information following Dr. Kaplan's initial assessment. In *Saffon*, the Ninth Circuit
9    emphasized that ERISA regulations called for a "meaningful dialogue" between a claims
10   administrator and plan beneficiary. *Saffon*, 522 F.3d at 870. In particular, the beneficiary was
11   entitled to "[a] description of any additional material or information" that was "necessary" to
12   "perfect [her] claim" in a manner "calculated to be understood by the claimant." *Ibid.* (citing 29
13   C.F.R. 2560.503-1(g)). Given this foundation, *Saffon* found that MetLife (who was the plan
14   administrator in that particular dispute) failed to properly inform the beneficiary of (1) why the
15   submitted medical documentation was insufficient to establish disability under the plan and (2)
16   what specific documentation would be sufficient to persuade the independent physician
17   consultant to find that the beneficiary was disabled. *See id.* at 870–71. *Saffon* finally noted that
18   objective medical documentation "proving" that the beneficiary's pain was disabling might
19   simply be unavailable in certain circumstances, and that should also be considered as part of the
20   "abuse of discretion" inquiry on remand. *Id.* at 872–73.

21   Here, Dr. Kaplan's initial report listed several types of objective medical information that
22   were absent in Beaver's file but were *necessary* to his proper evaluation of her claim. In
23   particular, Dr. Kaplan mentioned several times in his initial report that the lack of "orthopedic
24   records" and "physical examination reports" during the period in question made it impossible to
25   determine whether plaintiff's shoulder problems — mentioned by Dr. Messner in his appeal letter
26   — were functionally limiting. Beaver was never informed that these *particular* records were
27   necessary to perfect her appeal, or why the medical information she had already submitted
28   (including the letter from Dr. Messner) was insufficient to establish disability. Stated another

14

1   way, plaintiff was never told what specific documentation would be sufficient to persuade Dr.
2   Kaplan to find that she was disabled. *See id.* at 870–71.
3       In response to this argument raised by plaintiff, MetLife can only point to the June 16
4   letter it sent to plaintiff *prior to plaintiff's appeal* instructing her that to perfect her record, she
5   would need to submit (1) "[a]bnormal physical exam findings with medical rationale as to why
6   you are unable to perform functional job duties[;]" (2) "[c]urrent restrictions and limitations that
7   reflect the physical exam findings[;]" and (3) "[a]ny other testing or treatment records supporting
8   severity of impairment and your inability to perform essential duties of your job with or without
9   restrictions" (*id.* at 287–89S). This is insufficient under *Saffon*. By the time Dr. Kaplan had
10  reviewed Beaver's file and submitted his initial report, it was clear to MetLife what *specific*
11  medical information Dr. Kaplan required in order to evaluate plaintiff's functional limitations.
12  Beaver was entitled to a description of this information, as well as an explanation as to why the
13  documents she *did* submit — which contained detailed descriptions of her symptoms — were
14  insufficient to establish disability. *Id.* at 870. Giving copies of Dr. Kaplan's report to Beaver's
15  physicians was not a substitute to informing Beaver of these deficiencies.
16      Finally, it must be emphasized that Dr. Sieling — in his response to Dr. Kaplan's initial
17  report — notified MetLife that plaintiffs' condition might not be measurable by objective medical
18  findings at all. As such, there is no question that MetLife knew, based upon this statement and
19  Dr. Messner's October 4 letter, that plaintiff continued to suffer from significant pain following
20  her April 2008 surgery. MetLife also knew that such pain might not be provable based upon
21  objective medical records. Given these facts, MetLife's position would have been much stronger
22  had it conducted an in-person medical evaluation of plaintiff rather than rely solely on a paper
23  review of admittedly inadequate medical records. *See id.* at 872–73.

24                        *           *           *

25      Having considered the "abuse of discretion" factors set forth in *Montour* and *Abatie*, this
26  order finds that the administrative record demonstrates that MetLife abused its discretion in
27  denying plaintiff's request to extend her benefits from June 15 to July 15, 2008. This finding is
28  based in large part on the requirements set forth by the Ninth Circuit in *Saffon* compelling a

1  "meaningful dialogue" between a plan administrator and beneficiary before a claim is denied.

2  For these reasons, the motion for summary judgment must be **DENIED**.[2]

### 3. PLAINTIFF'S REQUEST FOR ADDITIONAL DISCOVERY

Since this order has determined that MetLife abused its discretion in denying plaintiff's extension of STD benefits between June 15 and July 15, 2008, plaintiff's request to conduct additional discovery on MetLife's "policies and procedures" and on Dr. Kaplan is **DENIED**. There is no further need for plaintiff to prove a "conflict of interest" on this claim.

### 4. REMAND TO PLAN ADMINISTRATOR

ERISA affords the court a wide range of remedial powers, including the power to return a benefits claim to a plan administrator for consideration of additional medical information. *See Williamson v. UNUM Life Ins. Co. of America,* 160 F.3d 1247 (9th Cir. 1998). This is especially appropriate in situations where it is impossible to know how the plan administrator would have acted had it not abused its discretion. Here, it is unknown whether MetLife would have found plaintiff "disabled" during the disputed period had it properly solicited, received, and considered the additional medical records discussed herein. As such, remand is appropriate.

### CONCLUSION

For the reasons set forth above, the motion for summary judgment is **DENIED**. Plaintiff's STD claim is hereby **REMANDED** to the plan administrator for reconsideration of plaintiff's entitlement to benefits during the period in dispute. The plan administrator shall allow plaintiff to supplement her file with any additional medical records necessary to evaluate plaintiff's disability, and shall give full and fair consideration to such records on remand.

**IT IS SO ORDERED.**

Dated: March 18, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[2] This finding did not rely on any medical evidence outside the administrative record. Consideration of such evidence is not appropriate in the determination of whether the plan administrator abused its discretion. *See Abatie*, 458 F.3d at 970.